UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ISCI HOLDINGS INC., | ) | Case No.:  2:20-cv-02789-JS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| ORBIT BIOMEDICAL, INC., and | ) | |
| GYROSCOPE THERAPEUTICS | ) | |
| LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff ISCI Holdings Inc., for its First Amended Complaint against Defendants

Orbit Biomedical, Inc. and Gyroscope Therapeutics Limited, states and alleges as follows:

**THE PARTIES**

1.      Plaintiff ISCI Holdings, Inc. is corporation organized under the laws of the

State of Delaware, with its principal place of business in Bloomington, Minnesota.  Before

a 2014 name change, ISCI Holdings was known as iScience Interventional Corporation.

ISCI Holdings is referred to in this Complaint as iScience.

2.      Upon information and belief, Defendant Orbit Biomedical is a corporation

organized under the laws of the state of Delaware with its principal place of business at

300 Brookside Ave., Building 18, Suite 180, Ambler, PA 19002.

3.     Upon information and belief, Gyroscope Therapeutics is a company organized under the laws of the United Kingdom, with its principal place of business at 300 Brookside Avenue, Building 18, Suite 180, Ambler, Pennsylvania 19002.

4.     Upon information and belief, and as indicated in a press release dated on or about April 11, 2019, Orbit and Gyroscope merged, with the combined entity doing business under the Gyroscope name.  On information and belief, and according to publicly available records from the Delaware Secretary of State, Orbit continues to be a Delaware Corporation in good standing.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 as this is an action arising under the laws of the Unites States, namely federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*  This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

6.     This Court has personal jurisdiction over Orbit because it has its principal place of business in this District and conducts extensive and continuing business activities in this District with respect to the subject matter of this action.

7.     This Court has personal jurisdiction over Gyroscope because it has engaged in continuous and systematic business activities in this District, which are directly related to the subject matter of this action, including its activities in Ambler, Pennsylvania, and its activities through Orbit.

8.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), 1391(c)(2) and/or 1391(c)(3), because all defendants reside in this District within the meaning of those statutes.

## FACTUAL ALLEGATIONS

9.     iScience was a leader in the design and development of devices that access structures within the human eye and treat diseases of the eye.

10.     One of the devices iScience developed was known as the iTrack 275 microcatheter.

11.     The iTrack 275 was designed to access the subretinal space without piercing the retina and without requiring removal of the vitreous within the eye.  The device includes a microcannula for injection or aspiration of fluids and a fiberoptic illumination system to allow the surgeon to locate the distal end of the microcatheter.

12.     Starting in or about February 2010, iScience entered into a series of agreements with Janssen Biotech, Inc. ("JBI"), and its predecessors, relating to the provision and further development and improvement of microcatheters, including the iTrack 275 microcatheter, and techniques of using such catheters to deliver a line of stem cells being developed by JBI to the subretinal space in the eye.

13.     iScience and JBI entered into such agreements in or about February 2010, December 2010, November 2012 and September 2013.   Over the course of these agreements, iScience microcatheters, including the iTrack 275 microcatheter, were used to deliver stem cells during human clinical trials.  iScience also worked with JBI to study the

- 3 -

performance of the microcatheters in clinical trials and develop improvements to the devices and their methods of use.

14.     JBI with the assistance and support iScience used the iTrack 275 in a clinical study (NCT 01226628) from about 2010 to about 2012 to deliver JBI's palucorcel stem cells to the subretinal space of patients.  This study provided valuable information on the performance of the iTrack 275 as a system for delivering cells to the subretinal space, and how the device could be improved.

15.     In or about September 2013, JBI and iScience entered into another agreement ("the 2013 Agreement").  In the 2013 Agreement, iScience granted JBI "an exclusive license (even as to iScience) under the iScience Patents and iScience Know-How to develop, make, have made, use, sell, . . .  and Commercialize Devices and Improvement in the Field . . . ."

16.     The 2013 Agreement defines "Device" or "Devices" as "the iScience catheters and related components that are set forth on APPENDIX 4 [which include the iTrack 275] and any Improvements thereto."

17.     The 2013 Agreement defines "Improvements" as "any change, improvement, development or modification of the Device, any component or material useful therein, or the methods or processes of making or using the Device, including without limitation, those Devices exemplified in the iScience Patents."

18.     During the course of the 2013 Agreement, JBI building on iScience's foundational work, continued to make Improvements to Devices, including the iTrack 275 microcatheter.

19.     During the course of the 2013 Agreement, JBI conducted further clinical trials using an improved Device, a modified version of the iTrack 275, which it (and later Orbit and Gyroscope) took to calling "the Janssen Device."

20.     The Janssen Device is a Device and an Improvement within the terms of the 2013 Agreement.

21.     In or about 2016, during the term of the 2013 Agreement, the Janssen Device was used in clinical trials (NCT 02659098) to deliver stem cells to the subretinal space of patients.

22.     The 2013 Agreement provides that "[i]n the event of termination," among other things, a) "all rights licensed herein shall revert to iScience;" b) that "JBI will, at its own expense, promptly assign or transfer to iScience all filings with regulatory authorities concerning Devices, including, without limitation, Regulatory Approval applications" upon payment by iScience for certain costs associated with such filings; and c) "JBI shall grant iScience a worldwide, royalty bearing license under JBI Patents and JBI Know-How that are reasonably necessary for the Development, manufacture and Commercialization of Devices." These provisions, including the reversion of "all rights licensed hereunder" to iScience, survive the termination of the 2013 Agreement and are not terminable by JBI.

23.     Pursuant to the 2013 Agreement, upon termination "all rights licensed herein" including the licensed right to "Develop, make, have made, use, sell, have sold, import, offer to sell and Commercialize Devices and Improvements in the Field" reverted to iScience.   This reversion of the right to "[d]evelop, make, have made, use, sell, have sold, import, offer to sell and Commercialize Devices and Improvements in the Field,"

survives termination of the 2013 Agreement and is not terminable by JBI, Orbit or Gyroscope.

24.     JBI terminated the 2013 Agreement effective as of October 2017.

25.     Notwithstanding the terms of the 2013 Agreement, JBI conveyed the licensed rights, including rights related to Devices and Improvements (which include the Janssen Device), to Orbit.

26.     At no point did JBI or Orbit advise iScience that JBI was conveying or anticipated conveying the licensed rights, including rights related to Devices and Improvements, which further include the Janssen Device, to Orbit.

27.     In responding to the letter of termination, iScience asked that JBI provide a description of all Improvements to the Devices made by or on behalf of JBI.  JBI responded, falsely, that no improvements were made.

28.     JBI and Orbit concealed from iScience their transaction conveying the licensed rights, and iScience had no independent means of discovering the transaction.

29.     The Founder of Orbit, Michael Keane, led the JBI group that was working on subretinal delivery of cells using Devices and Improvements (including the Janssen Device) licensed under the 2013 Agreement.  Mr. Keane, who is now Chief Technology Officer of Gyroscope, was involved in negotiations relating to the 2013 Agreement on behalf of JBI.

30.     On information and belief, others who worked for Orbit also worked on the iTrack 275 and the Janssen Device at JBI.

31.     On information and belief, Orbit was aware of the terms of the 2013 Agreement between JBI and iScience.  Michael Keane, the founder of Orbit and now Chief Technology Office of Gyroscope, was involved in negotiations relating to the 2013 Agreement on behalf of JBI.

32.     The routine due diligence prior to the transaction between JBI and Orbit would have included a review of agreements relating to the Devices and Improvements (including the Janssen Device) and would have revealed the terms of the 2013 Agreement between JBI and Orbit.  On information and belief, Orbit reviewed the 2013 Agreement prior to its transaction with JBI.

33.     On information and belief, Orbit induced JBI to convey the licensed rights regarding Devices and Improvements (which include the Janssen Device) to Orbit, notwithstanding the terms of the 2013 Agreement between JBI and iScience.  These rights had reverted to iScience pursuant to the terms of the 2013 Agreement.

34.     A Gyroscope press release dated on or about April 11, 2019, indicates that Orbit and Gyroscope merged, with the combined entity doing business under the Gyroscope name.  Gyroscope continues to market and sell the Devices and Improvements that reverted to iScience under the terms of the 2013 Agreement.

35.     To the extent that Gyroscope and Orbit have merged, Gyroscope bears liability for the previous misconduct of Orbit as Orbit's successor in interest.  At the time of the merger, the rights that Orbit unlawfully acquired from JBI were a significant if not the primary asset of Orbit.  Gyroscope proceeded with the merger to gain the benefit of the rights that Orbit had unlawfully acquired from JBI.

## COUNT I
## (MISAPPROPRIATION OF TRADE SECRETS)
## (18 U.S.C. § 1836 et seq., and State Law)

36.     iScience realleges Paragraphs 1 to 35 of the First Amended Complaint as if fully set forth herein.

37.     iScience and JBI entered into a contractual relationship which provided for the disposition of licensed rights upon termination.  In particular, the 2013 Agreement between JBI and iScience provided that upon termination the licensed rights, including the right to commercialize Devices and Improvements reverted to iScience, which necessarily included all information and know-how relating to Devices and Improvements as defined in the 2013 Agreement.

38.     Despite the terms of that Agreement, JBI turned over all the information and know-how relating to Devices and Improvements, including the iTrack 275 and the Janssen Device, to Orbit, which has now merged with Gyroscope.

39.     Information and know-how relating to Devices and Improvements and their methods of use included closely guarded trade secrets that held independent economic value from not being known to, or readily ascertainable by proper means by those who could obtain economic value from its disclosure and use.  Under the terms of the 2013 Agreement, upon termination "all rights licensed herein," including the right to "Commercialize Devices and Improvements," "shall revert to iScience."  Accordingly, under the terms of the 2013 Agreement, iScience owned, or at a minimum had the lawful right to possess and use those trade secrets and prevent their disclosure to and use by Orbit and Gyroscope.

- 8 -

40.     Such trade secret information included for example, device design and manufacturing details, details on the surgical methods, and feedback from surgeons performing procedures in the clinical trials using the iTrack 275 and the Janssen Device, and in particular feedback on how iTrack 275 and the Janssen Device performed, the tactile response they gave, their usability, the quality and effectiveness of the training associated with using the device and other operational characteristics of the devices. This information was important for the development of Devices and Improvements, including but not limited to the Janssen Device and any further improvements to it, and had economic value for those reasons.

41.     This information, including feedback from a range of surgeons, on how the devices performed, the methods developed for using the devices, the tactile response the devices gave, the usability of the devices and surgical methods, and the quality and effectiveness of the training associated with the devices and surgical methods and other operational characteristics of the devices, all had economic value because they were not known or readily ascertainable by proper means.

42.     This detailed information was not made public and was not included in articles published years later generally describing the results of the clinical trials. This detailed information was not readily accessible to third parties by proper means and was governed by contractual confidentiality obligations. Further, this detailed information from carefully controlled and regulated clinical trials could not be recreated or reverse engineered.

43.     This information had independent economic value because it provided data from a range of surgical teams and patients, which could be used to evaluate not only the devices themselves, but also the surgical methods that were used, and the training and education provided to the surgical teams.

44.     This data not only allowed for such evaluation, it also suggested ways in which the devices, the surgical methods and the training and education programs could be improved.

45.     The fact that this detailed information had independent economic value from not being known or readily ascertainable is demonstrated, for example, by the fact that Orbit paid a significant amount, believed to be in the millions of dollars, to acquire the Janssen Device and related technology, know-how and rights from JBI.

46.     Orbit is, on information and belief, the creation of a former JBI insider – Michael Keane – and the Syncona Group – a publicly traded London-based investor in life science companies that describes itself on the "who we are" page of its website as a company that "founds, builds and funds companies in innovative areas of healthcare, targeting the superior risk-adjusted returns available from commercialising exceptional science."   https://www.synconaltd.com/about-us/our-story.

47.     Orbit, on information and belief, was created to acquire the Janssen Device, related technology, know-how and rights from JBI.  On information and belief, Orbit had no significant assets other than cash until it acquired the Janssen Device, related technology, know-how and rights from JBI.

- 10 -

48.     If the "exceptional science" represented by the Devices and Improvements developed under the 2013 Agreement, including the Janssen Device, could have been gleaned by reviewing some ophthalmic journals or otherwise canvassing public domain sources then sophisticated insiders like Michael Keane and seasoned corporate "founders, builders and funders" like Syncona would not have spent millions to acquire those assets unlawfully from JBI.

49.     In a September 2020 interview Mr. Keane states:  "I was one of the founders of Orbit Biomedical in 2018. We founded Orbit because we felt strongly that our new approach to subretinal delivery could enable the whole field of cell and gene therapy."  See https://www.medgadget.com/2020/09/orbit-subretinal-delivery-system-for-gene-therapy-interview-with-mike-keane-cto-of-gyroscope-therapeutics.html.     The Devices and Improvements developed under the 2013 Agreement were the heart of the "new approach" to subretinal delivery that Mr. Keane touts.

50.     When asked to describe the advantages of the "new approach," Mr. Keane explained:  "To access the subretinal space, ophthalmologists typically preform a vitrectomy (a procedure that involves removing the vitreous, the gel-like substance that fills the eye) followed by creating a retinotomy (a hole in the retina)."  Id.  Mr. Keane elaborated:  "The Orbit SDS is indicated for microinjection into the subretinal space at the back of the eye.  The microinjection procedure is designed to avoid damaging the structure of the eye by preventing the need for a vitrectomy and eliminating the need to create a retinotomy in order to access the subretinal space."  Id.  The advantages touted by Mr.

Keane are the advantages of the Devices and Improvements developed under the 2013 Agreement, the rights to which reverted to iScience.

51.     Orbit gave a presentation at the Alliance for Regenerative Medicine in March 2019.   At this presentation, Orbit's then-CEO, Dr. Susan Hill, gave an overview of Orbit and the subretinal delivery system:  "The Company has been founded based on technology that was developed by Janssen in the context of a cell therapy program.  And we are extremely lucky to count among our founders the device technology experts who developed       the       technology       that       I       will       show       you." https://www.youtube.com/watch?v=PXjNVzZlf0M

52.     Dr. Hill explained of the delivery system, "it's been developed with input of many retinal surgeons to make sure that its usable within the OR [operating room]."  Id.

53.     Dr. Hill went on to note that the device has the advantage that it doesn't require piercing the retina or removing the vitreous.  Id.

54.     Dr. Hill explained the importance of the clinical trials using the Janssen Device:  "Janssen took the device into a clinical trial in 21 Dry AMD [age-related macular degeneration] subjects.  And they ran the study across eight different surgical centers and they used eight different surgeons, not because they needed to do that to recruit the subjects, but more because they wanted to have eight surgeons involved in the training and in using the device.  And the study was a usability study so it was looking at using the device and it looked at the safety of the cell therapy product that was being delivered. And it generated some great data, so through that clinical data we know that we can use the device to deliver successfully to the subretinal space."  Id.

55.     Other trade secret information relates to the details of Devices and Improvements, including the Janssen Device and how they are manufactured.

56.     iScience took reasonable steps to protect the secrecy of these trade secrets including through the use of confidentiality agreements including the confidentiality provisions in the 2013 Agreement and other agreements between JBI and iScience. Confidentiality provisions are commonly used in business to protect trade secrets.

57.     Further, iScience took reasonable steps to protect these trade secrets through the provisions of the 2013 Agreement which provide that upon termination the licensed rights revert to iScience.

58.     The 2013 Agreement included provisions restricting the use of information disclosed or developed during the term of the agreement.

59.     The 2013 Agreement also contains provisions providing for disclosure of proposed scientific publication prior to submission and prior to publication and allowing for review and objection to such publication the reviewing party able to make objections and prevent such publication.

60.     iScience also protected these trade secrets from disclosure or sale to third parties through the reversion of rights provisions in the 2013 Agreement which provide that upon termination, all licensed rights revert to iScience, including the right to Commercialize Devices.

61.     It was reasonable for iScience to protect these trade secrets through such contractual confidentiality provisions and reasonable for iScience to expect JBI to adhere to these contractual obligations that JBI voluntarily undertook.

62.     As described in more detail above, the trade secrets derive independent economic value from not being known or readily ascertainable, as indicated by the fact that they led to the development of Devices and Improvements, including the Janssen Device, and as demonstrated by the statements of Orbit's Dr. Hill (who also served as Chief Business Officer at Gyroscope) quoted above.

63.     Under the terms of the 2013 Agreement, the right to Commercialize Devices and Improvements, including the iTrack 275 and the Janssen Device reverted to iScience upon termination.  Neither JBI nor Orbit nor Gyroscope had the right to terminate, cancel or override that reversion.

64.     On information and belief, Orbit knew of the terms of the 2013 Agreement. Accordingly, Orbit acquired access to the trade secrets under circumstances giving rise to a duty to maintain its secrecy.  Orbit acquired the trade secrets from a JBI.  JBI owed iScience a duty to maintain the secrecy of the trade secrets or limit their use.  Those duties owed by JBI to iScience sprang at least from the confidentiality provisions, reversion of rights provisions and other provisions of the 2013 Agreement.  Orbit knew or had reason to know that the trade secrets were derived from a third party (JBI) that owed iScience a duty of secrecy.   Orbit was founded by a JBI insider, Michael Keane, who led the development of Devices and Improvements under the 2013 Agreement and was involved in negotiations relating to the 2013 Agreement.  As such, on information and belief, Orbit was aware of the terms of the 2013 Agreement and the iScience's role in the development of Devices and Improvements.

65.     Orbit misappropriated trade secrets, including those originally developed by iScience, those developed by iScience in collaboration with JBI, and those developed by JBI under the terms of the 2013 Agreement, by inducing JBI to convey all rights to the Improved Devices to Orbit.

66.     Orbit has misappropriated trade secrets in violation of the federal Defend Trade Secrets Act 18 U.S.C. § 1836, et seq., and applicable state law.

67.     Orbit and its successor, Gyroscope, have misused the trade secrets to market the Janssen Device and develop further improvements of that device.  These violations have caused harm  to iScience, which has been prevented from realizing the benefit of the trade secrets, including through commercializing them and Commercializing Devices and Improvements.

## COUNT II
## (TORTIOUS INTERFERENCE WITH CONTRACT)

68.     iScience realleges Paragraphs 1 to 67 of the First Amended Complaint as if fully set forth herein.

69.     iScience and JBI entered into a contractual relationship which provided for the disposition of licensed rights upon termination.  In particular, the 2013 Agreement between JBI and iScience provided that upon termination the licensed rights, including the right to commercialize Devices and Improvements reverted to iScience.  That reversion was not terminable by JBI, Orbit or Gyroscope.  That reversion and the associated rights, including the right to Commercialize Devices and Improvements survived termination of

the 2013 Agreement and those contractual rights were valid, subsisting and in full force and effect when Orbit unlawfully interfered with them.

70.     Given that the founder of Orbit previously worked at JBI, and led the team developing Devices and Improvements and was involved in negotiations relating to the 2013 Agreement, and given that any agreements relating to Devices and Improvements would have been reviewed as part of routine due diligence prior to the JBI-Orbit transaction, Orbit was aware of the terms of the 2013 Agreement between JBI and iScience, and nevertheless induced JBI to convey rights relating to Devices and Improvements, including the right to Commercialize Devices and Improvements, to Orbit, causing JBI to breach its post-termination obligations and deprive iScience of its post-termination rights.

71.     Orbit intentionally interfered with the contractual relationship between JBI and iScience and intended to harm iScience by interfering with the contractual relationship between JBI and iScience.

72.     iScience spent years working with JBI and its predecessors in an effort to deliver stem cells to the subretinal spaces of patients safely and effectively using the iScience iTrack 275 microcatheter while also working to improve the microcatheter device and methods of using it.  The 2013 Agreement gave JBI a license to Commercialize Devices and Improvements, but provided that if JBI terminated the agreement, those rights reverted to iScience.  In this way, if JBI terminated the agreement, iScience would still be able to Commercialize the Devices and Improvements that it had been working on for years.

73.     JBI and Orbit had no right to cancel or override that reversion of rights to iScience.   Orbit's conduct interfered with iScience's reasonable and justified expectation that upon termination, it would have the right to Commercialize the Devices and Improvements.

74.     In interfering with iSciences contractual relationship with JBI, Orbit acted without privilege or justification.

75.     Neither JBI nor Orbit had the right to terminate the reversion of rights to iScience, as such, Orbit's conduct cannot be excused as mere competition.

76.     Rather, Orbit, a company founded by a JBI insider who was involved in negotiations relating to the 2013 Agreement, intentionally induced JBI to transfer to Orbit devices, related technology, know-how and rights which, by the terms of the 2013 Agreement had reverted to and belonged to iScience.

77.     In doing so, Orbit directly interfered with iScience's lawful and subsisting contract rights, which involved iScience's right to commercialize Devices and Improvements.   iScience worked with JBI and licensed its rights in the development of Devices and Improvements, with the proviso that if JBI terminated the 2013 Agreement all licensed rights, including the right to Commercialize Devices and Improvements would revert to iScience.

78.     Licenses and reversions are common provisions of agreements relating to technology.   Orbit's conduct violated the established norms, customs and practices of the industry.   iScience has a strong interest in the security of its rights which already been consolidated into the binding legal obligation of a contract.

79.     iScience's interest in the security and maintenance of its established contract rights outweigh any interest of Orbit in unlawfully arrogating those rights to itself.

80.     iScience has been actually harmed by Orbit's interference with iScience's contractual relationship with JBI.   Orbit's actions have prevented iScience from Commercializing Devices and Improvements.   Instead, Orbit has usurped opportunities that should have been iScience's and profited and been unjustly enriched by years of work that iScience put into developing the Devices and Improvements, including the iTrack 275 and the Janssen Device.

81.     But for Orbit's interference, iScience would have Commercialized Devices and Improvements as was its right under the 2013 Agreement between JBI and iScience. For example, iScience could have Commercialized Devices and Improvements by licensing them to Orbit or to other companies.

82.     Orbit interfered with iScience's contractual relationship with knowledge of that relationship and with the specific intent to harm iScience and to cause JBI to convey to Orbit rights that had reverted to iScience under the 2013 Agreement.

83.     Orbit's interference has unjustly enriched, and continues to unjustly enrich, Orbit at the expense of iScience.

84.     Orbit's interference has harmed iScience, irreparably, and will continue to do so unless enjoined.

85.     But for Orbit's interference, iScience would not have suffered these harms.

## COUNT III
## (<u>CONVERSION</u>)

86.    iScience realleges Paragraphs 1 to 85 of the First Amended Complaint as if fully set forth herein.

87.    Through its wrongful conduct alleged herein, Orbit has converted and deprived iScience of its property rights relating to the Devices and Improvements, including but not limited to the Janssen Device.  By its conduct, Orbit deprived iScience of property rights associated with the right to Commercialize Devices and Improvements which reverted to iScience under the terms of the 2013 Agreement.  The converted property rights include tangible property such as engineering drawings, specifications, prototypes, surgical protocols, engineering drawings, bills of materials, as well as other tangible property associated with right to Commercialize Devices and Improvements.  The property rights improperly converted also include designs and intellectual property merged in and/or physically embodied in such drawings, specifications, prototypes, protocols, engineering drawings, bills of materials and the like.

88.    Orbit has deprived iScience of its lawful control of these tangible property rights and has acquired possession of these tangible property rights with the intent to assert a right to them which is adverse to iScience.  Orbit's conversion has deprived iScience of the right to use its lawful rights, including the right to Commercialize Devices and Improvements.

89.    The property rights were converted by Orbit without iScience's consent and without lawful justification.

90.     Orbit has unlawfully converted such property, all to the benefit of Orbit and now Gyroscope.

91.     Orbit's conversion has harmed and continues to harm iScience, irreparably.

**COUNT III**
**(UNJUST ENRICHMENT)**

92.     iScience realleges Paragraphs 1 to 91 of the First Amended Complaint as if fully set forth herein.

93.     Orbit and Gyroscope have been, and are continuing to be, unjustly enriched by the conveyance to them of rights in Devices and Improvements, including rights in the Janssen Device, which belonged to iScience under the terms of the 2013 Agreement.

94.     On information and belief, at the time JBI conveyed rights in the Janssen Device to Orbit, Orbit was aware of the terms of the 2013 Agreement.  Michael Keane, the founder of Orbit and now Chief Technology Officer of Gyroscope, previously worked at JBI where he led the team working on Devices and Improvements, and was involved in negotiations relating to the 2013 Agreement while he was at JBI.

95.     iScience technology and contributions were central to the development of Devices and Improvements, including the Janssen Device.  iScience technology and contributions were the foundations of the Janssen Device.  As such, iScience conferred a substantial benefit on JBI, Orbit and Gyroscope.

96.     iScience indirectly, if not directly, conferred substantial benefits on Orbit and later Gyroscope when they obtained the tangible property and intellectual property

- 20 -

associated with, and rights to commercialize, the "exceptional technology" that the Janssen device represents.

97.     The benefit iScience conferred on Orbit and Gyroscope includes the subretinal delivery system that was developed and built based on the iTrack 275, that was improved through experience gained in clinical trials, and now called the Janssen Device.

98.     Janssen Device was also the subject of clinical trials during the term of the 2013 Agreement.  Those clinical trials and the use of the device by several surgical teams is benefit that Orbit's (and later Gyroscope's) Susan Hill touted in the industry:  "Janssen took the device into a clinical trial in 21 Dry AMD [age-related macular degeneration] subjects.  And they ran the study across eight different surgical centers and they used eight different surgeons, not because they needed to do that to recruit the subjects, but more because they wanted to have eight surgeons involved in the training and in using the device. And the study was a usability study so it was looking at using the device and it looked at the safety of the cell therapy product that was being delivered. And it generated some great data, so through that clinical data we know that we can use the device to deliver successfully to the subretinal space."

99.     The benefit of the Janssen Device and the underly technology and clinical experience is a benefit that iScience conferred, at least indirectly via JBI, on Orbit and later Gyroscope.

100.     The conveyance of rights from JBI to Orbit conferred a benefit on Orbit and later Gyroscope.  That benefit was conferred on Orbit and Gyroscope at least indirectly by iScience via JBI.

101.    Orbit and Gyroscope have accepted and retained the benefit conferred on them by iScience.   Orbit and Gyroscope have received significant financial and other rewards as a result of this benefit.

102.    Under the circumstances, allowing Orbit and Gyroscope to retain the benefits from their development, marketing and commercialization of the Janssen Device and other Devices and Improvements would be unjust, unwarranted and inequitable.

103.    All proceeds from the Janssen Device, as well as all further improvements to the Janssen Device, and all related know-how and intellectual property should be held in constructive trust for the benefit of iScience.

## PRAYER FOR RELIEF

WHEREFORE, iScience prays for relief as follows:

1.    A judgment that Orbit and Gyroscope have misappropriated trade secrets relating to Devices and Improvements, including the iTrack 275 and the Janssen Device;

2.    A judgment that Orbit and Gyroscope tortiously interfered with iScience's contractual relations with JBI, and in particular the 2013 Agreement;

3.    A judgment that Orbit and Gyroscope have converted iScience's property rights relating to the Devices and Improvements, including the iTrack 275 and the Janssen Device; and

4.    A judgment that Orbit and Gyroscope have been unjustly enriched by JBI's conveyance to them of rights which properly belonged to iScience under the terms of the 2013 Agreement;

5.      An award of damages for misappropriation of trade secrets, tortious interference with contract, conversion and unjust enrichment, including but not limited to compensatory damages, disgorgement of profits and/or a constructive trust.

6.      An award of attorneys fees as may be provided by law; and

7.      Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, iScience hereby demands a jury trial as to all issues so triable.

Dated: November 2, 2020

Respectfully submitted,

*/s/ Eric J. Monzo*
Eric J. Monzo (I.D. No. 89793)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
emonzo@morrisjames.com

OF COUNSEL
Devan V. Padmanabhan
Sri K. Sankaran
PADMANABHAN & DAWSON, P.L.L.C.
45 South 7th Street, Suite 2315
Minneapolis, MN 55402
Telephone:  (612) 444-3601
devan@paddalawgroup.com
sri@paddalawgroup.com